UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  05-cr-360 (HHK) |
| | : | |
| v | : | |
| | : | |
| ERIK J. GINYARD | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing.  For the reasons set forth herein, the government respectfully recommends that the Court, increase the defendant's criminal history category to V, and sentence the defendant to a period of incarceration at the upper end of the Guidelines range calculated based on that corrected criminal history score.

**I.   BACKGROUND**

On February 24, 2006, the defendant, Erik Ginyard, pled guilty to one Count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year in violation of 18 U.S.C. §922(g)(1).  As part of his plea, the defendant agreed that the following facts would have been established beyond a reasonable doubt had this case gone to trial:   On August 28, 2005, at approximately 4:45 p.m., an officer of the Metropolitan Police Department responded to a radio run for Assault with Dangerous Weapon at 740 Kenilworth Avenue, N.E., in Washington, D.C.  The dispatcher gave a lookout for the suspect and indicated that he was armed and last seen running towards the Metro station at 4000 Minnesota Avenue, N.E.  Shortly thereafter, the defendant was sighted by the police in the rear of 4000 Minnesota Avenue, N.E.  The defendant matched the lookout, and had a gunshot wound in his right forearm.  A civilian witness then approached a police officer on

the scene, identified the defendant and indicated that he had observed the defendant shooting a handgun on the street outside the Metro station. The witness then took an officer outside the station and showed the area where he had observed the defendant discarding a black handgun after the shooting. An MPD Officer canvassed the area indicated and recovered a black .45 caliber Springfield 1911 with three rounds in the magazine, one in the chamber and the hammer still cocked. Post-arrest and post-rights, the defendant gave a statement to police wherein he admitted to being involved in a shoot-out outside the Metro station.

The defendant further admitted as part of his plea that the .45 caliber Springfield 1911 and three rounds of ammunition were manufactured outside of the District of Columbia. Finally, the defendant admitted that, prior to this incident, on June 15, 1998, he was convicted of Assault with a Dangerous Weapon (Gun) and Robbery in F-8583-97 in D.C. Superior Court, and on March 26, 2003, he was convicted of Assault with Intent to Kill while Armed in F-9115-97 – both crimes punishable by a term of imprisonment of more than one year.

## II.     SENTENCING CALCULATION

### A     Statutory Maximum

The maximum sentence for Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding one Year in violation of 18 U.S.C. §§922(g)(1), a Class C felony, is incarceration for a period not more than 10 years and/or a fine of $250,000, or both.

### B.     United States Sentencing Guidelines Calculation

The Presentence Report writer has calculated defendant's total offense level to be 21 and a criminal history category of IV. Thus, the defendant's Guidelines range for violation of 18

U.S.C. § 922(g) would be 57 to 71 months. PSR at ¶ 55. As addressed in Section III below, however, because the defendant's criminal history category should properly be calculated as a V, his Guidelines range should be, instead, 70-87 months.

In any event, under either calculation, the applicable Guidelines range is in Zone D of the Sentencing Table and the defendant would not be eligible for probation. See USSG § 5B1.1, Comment n. 2, and USSG § 5C1.1(f).

    C.  The Impact of Booker

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 543 U.S. at 258. However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. See 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review by courts of appeals for "reasonableness." Id. at 261.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See

Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker at 262 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at 253 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 250 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 292 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 304-05 (dissenting opinion of Scalia, J.)

("the primary objective of the Act was to reduce sentencing disparity.").

Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals. This is so, said the court in United States v. Wilson, 350 F. Supp.2d 910 (D. Utah 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 950. A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further in Section IV below, no unusual circumstances exist that warrant an exception to the preference for guidelines sentencing in this case.

### III. THE PRESENTENCE INVESTIGATION REPORT INCORRECTLY CALCULATES THE DEFENDANT'S CRIMINAL HISTORY CATEGORY

The Presentence Investigation Report incorrectly calculates the defendant's Criminal History Category as a IV, when it should be V.  PSR ¶ 28.  The basis for this error is the report's calculation of only one criminal history point for the defendant's November 11, 1997 conviction for Assault with Intent to Kill while Armed (AWIK while Armed), rather than the three points typically required under § 4A1.1(a) for each prior sentence of imprisonment exceeding one year and one month.[1]  PSR ¶ 23.  Only one criminal history point was assigned for the AWIK while Armed conviction under § 4A1.1(f)[2] because, according to the presentence report, the charge was related to the defendant's October 28, 1997, convictions for Robbery and Carrying a Dangerous Weapon (Robbery/CDW).  PSR ¶¶ 22, 23; PSR at p. 15, "Objections."  As demonstrated below, the report's failure to assess a full three points for the AWIK while Armed conviction was in error – an error which was compounded by the fact that it places the defendant in a lower Criminal History Category.  Had the defendant received the full three points for his November 11, 1997, AWIK while Armed conviction his criminal history score would have been an 11 rather than a 9, and his Criminal History Category would have been a V rather than a IV.  See PSR ¶ 28.

The defendant's AWIK while Armed conviction is properly assessed the full three points

---

[1] The defendant was sentenced to 15 years incarceration on the Assault with Intent to Kill While Armed charge.  PSR ¶ 23.

[2] Under §4A1.1(f), one point is given for each prior sentence resulting from a conviction of a crime of violence that did not otherwise receive any points because the sentence was considered related to another sentence resulting from a conviction of a crime of violence.  See §4A1.1(f).

-6-

under § 4A1.1(a) because that conviction is <u>not</u> related to the defendant's October 28, 1997, Robbery/CDW conviction. The Guidelines require that prior sentences imposed in unrelated cases be counted separately, and that prior sentences in related cases be treated as a single sentence. See § 4A1.2(a)(2). The Guidelines define a "related case" as follows:

> Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (<u>i.e.,</u> the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

§ 4A1.2, comment. n. 3. The PSR report here found that the defendant's October 27, 1997 Robbery/CDW and November 11, 1997, AWIK while Armed convictions were related because, while they were separated by an intervening arrest, the defendant was not "arrested for the first offense prior to committing the second offense" as indicated in the parenthetical in the first sentence of the Guidelines' related case definition. See PSR at p. 15, "Objections." Rather, in this case, the defendant was charged with the first offense, AWIK while Armed, after having been arrested on the second offense, Robbery/CDW. PSR at ¶¶ 22-23. According to the PSR report, this fact alone makes the offenses related and requires the assessment of only one criminal history point for the AWIK while Armed conviction under §4A1.1(f), rather than the full three points under §4A1.1(a). See PSR at p. 15, "Objections."

The PSR report is incorrect. The Guidelines instruct that offenses are unrelated if they were for offenses that were separated by an intervening arrest. § 4A1.2, comment. n. 3. Here, there is no dispute that the two offenses were in fact separated by an intervening arrest. While it is true that the defendant was not "arrested for the first offense prior to committing the second offense" as delineated in the parenthetical to the first sentence of the Guidelines' definition,

logically, the fact that the defendant was arrested on the second offense before he was arrested on the first offense[3] should make no difference to the related case analysis.  In either case, the offenses were separated by an intervening arrest, thus, strongly indicating that the arrests were not related.  The Government could find no case law to the contrary.[4]

Furthermore, even if the events underlying the two convictions were <u>not</u> separated by an intervening arrest because the defendant fortuitously was not arrested on the first offense until after his arrest on the second, that fact alone would not conclusively determine that the offenses were related under the Guidelines' related case definition.  The PSR report assumes that this is the case.  It is not.  While it is true that if there is an intervening arrest, then the offenses would be conclusively deemed "unrelated" under the Guidelines' definition, <u>the opposite is not true</u>.  <u>See</u> § 4A1.2, comment. n. 3.  That is, it is not the case that where there is no intervening arrest between offenses, such offenses are always deemed related under the Guidelines' related case

---

[3] The defendant committed the AWIK while Armed on July 26, 1997, but was not apprehended at that time.  PSR ¶ 23.  Thereafter, on October 28, 1997, the defendant committed the armed Robbery/CDW.  PSR ¶ 22.  He was apprehended on that same day, some thirty minutes after the armed robbery.  Following his arrest in that case, and the recovery of a handgun seized in a vehicle used in the robbery, the gun was traced to the July 26, 1997 AWIK while Armed.  <u>See id</u>.  The defendant was then pursued as a suspect in the that case.  Following the victim's positive identification of the defendant as the shooter, the defendant was arrested in DC Jail on the AWIK while Armed charges.  <u>See id</u>.

[4] Undersigned counsel found no cases addressing this issue in this District.  Undersigned counsel could find no cases from any other District, where a Court held two offenses were related under the Guidelines only because a defendant fortuitously was not arrested on the first offense until after his arrest on the second.  Indeed, the government was able to identify two <u>unpublished</u> Court of Appeals cases from Fourth and Ninth Districts were it was held, as the government advances here, that a defendant's prior convictions resulting from separate arrests were "unrelated" for purposes of the Sentencing Guidelines despite the fact that no charges were filed for the first offense until after the defendant's arrest on the second offense.  <u>See</u> <u>United States v. Roberts</u>, 142 Fed. Appx. 307 (9th Cir. 2005); <u>United States v. Melvin</u>, 147 Fed. Appx. 370, 2005 WL 2295505 (4th Cir. 2005).

definition. Otherwise, the second sentence of the definition delineating factors for the Court to consider in determining relatedness would be mere surplusage. Accord United States v. Gallegos-Gonzales, 3 F.3d 325, 327 (9th Cir.1993); United States v. Hallman, 23 F.3d 821, 825 (3d Cir.), cert. denied, 513 U.S. 881, 115 S.Ct. 216, 130 L.Ed.2d 144 (1994); United States v. Boonphakdee, 40 F.3d 538, 544 (2nd Cir. 1994). It is those factors that need to be considered by the Court where the first sentence of the definition has no application, that is, when there is no intervening arrest as that term is defined by the Guidelines. See id. Stated another way, the first sentence of the related case definition provides a preliminary test delineating offenses that are not related – i.e., those where there is an intervening arrest – regardless of the additional factors listed in the definition's second sentence. See id. Where there is no intervening arrest between the offenses at issue as defined by the Guidelines, then the Court must consider the factors listed in the second sentence of the definition to determine whether the offenses are in fact related. Where those factors indicate that the offenses are unrelated, then they should be treated as such in calculating the defendant's criminal history score.

In this case, even if you assume there is no intervening arrest as defined by the first sentence of the Guidelines' related case definition (because the defendant fortuitously was not arrested on the first offense until after his arrest on the second), the factors listed in the second sentence of the Guidelines' definition all point to the offenses still being unrelated. Specifically, the AWIK while Armed and Robbery/CDW did not "occur on the same occasion," were not "part of a singled common scheme or plan," and were not "consolidated for trial or sentencing." § 4A1.2, comment. n. 3. Rather, the two offenses occurred on different dates with different victims, involved different substantive offenses (Robbery v. AWIK), and each received a

sentence independent of the other meted out at different times. Thus, even assuming there was no "intervening arrest" as that term is defined by the first sentence of the Guidelines' related case definition, the offenses at issue would still be deemed unrelated following application of the factors listed in the second sentence. The offenses were separate and each should be given separate weight in the defendant's criminal history calculation.

Accordingly, the defendant should receive the full three points for each conviction under §4A1.1(a), his criminal history score should be adjusted upward from a 9 to an 11, and his Criminal History Category should be adjusted upward from a IV to a V. This change will result in the defendant's Guidelines range increasing to 70-87 months.

## IV.   DEFENDANT SHOULD BE SENTENCED AT THE UPPER END OF THE CORRECTED GUIDELINES RANGE

The Government recommends that the Court sentence the defendant at the upper end of the correct Guidelines range of 70-87 months. Such a sentence would not only be presumptively reasonable, for the reasons outlined in section II.C. above, but would also be justified by consideration of the sentencing factors enumerated in 18 U.S.C. § 3553. Those factors fall into three main categories: the nature of the offense, the needs of the public, and the history and characteristics of the defendant. United States v. Ranum, 353 F. Supp.2d 984, 989 (E.D. Wis. 2005).

Given the extraordinary level of gun violence in this city, possession of a loaded handgun by an individual having previously been convicted of a felony is a very serious offense in any case. The defendant's conduct here, however, was far more reprehensible than that presented in the average 922(g) case. Mr. Ginyard did not simply possess the gun at issue – he used it. He

admittedly engaged in a gun battle on a public street outside of a Metro station at 4:45 p.m.  In doing so, the defendant demonstrated extreme indifference to the safety of himself, whoever he was shooting at, and to passers-by outside the Metro.  The Court needs to send an unambiguous message to the defendant, and the community, that possession of guns and engaging in gun battles on the city's streets is extremely reckless and dangerous conduct that will not be tolerated.

Apart from the seriousness of the present offense, the defendant also has a significant criminal history of gun violence that should be weighed heavily by the Court in fashioning the defendant's sentence.  The present offense is not the defendant's first gun offense.  Rather, he has twice before been convicted of violent gun crimes.  As is described in the Presentence Report, in July 1997 the defendant "settled a dispute" by shooting another person with a handgun out on the street in the 1100 block of Eaton Road, S.E., causing the victim to suffer injuries to his wrist and upper body and resulting in the loss of the victim's spleen.  PSR ¶ 23.  Three months later, the defendant used a shotgun to rob a person of their wallet and pager in the 1300 block of Howard Road, S.E.  PSR ¶ 22.  More recently, in February 2003, the defendant was convicted of Distribution of Marijuana, again in the 1100 block of Eaton Road, S.E..  PSR ¶ 24.  The defendant's repeat gun conviction now before the Court plainly demonstrates that he has not learn from his past transgressions and continues to present a real and present danger to the community.

Given the defendant's prior convictions for gun violence, it would not be too much to expect that he would stay away from handguns for the rest of his life.  The defendant chose to violate that simple prohibition here and, worse, engaged again in a gun battle on the streets of this city.  And for that, he should be held accountable.

Finally, its should be noted that the defendant has already received a substantial benefit for his early acceptance of responsibility. Specifically, the defendant received a three point decrease in his offense level under the Guidelines. Had the defendant not received this benefit, his (corrected) Guidelines range would have been 92-115 months rather than 70-87 months. Accordingly, the defendant has already received all the leniency he should under the plea. Sentencing the defendant at the upper end of the Guidelines range would serve the interests of the community and give both the government and the defendant the benefit of the bargain negotiated.

## V.   CONCLUSION

The nature of the offense, the needs of the public and the defendant's criminal history all suggest a period of incarceration at the upper end of the Guidelines range of 70-87 months would be appropriate. Such a sentence would reflect the seriousness of this offense, the community's need for protection from the dangers posed by the defendant's reckless conduct, and by his serious criminal history.

Respectfully,

KENNETH L. WAINSTEIN
United States Attorney
Bar No. 451058

G. Michael Harvey
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.  #4243
Washington, DC 20001
Phone: 305-2195; Fax: 616-3782

D.C. Bar No. 447465

CERTIFICATE OF SERVICE

 I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant, Lara Quint, Esquire, this 12th day of June, 2006.

               _____
               G. Michael Harvey
               Assistant United States Attorney